IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A WHITE IPHONE WITH NO CASE, A RED IPHONE WITH A CLEAR FLORAL CASE AND A PINK IPHONE CURRENTLY IN POSSESSION OF HOMELAND SECURITY INVESTIGATIONS | No. 23-mj-1887 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Nicholas C. Pisani, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— three electronic devices —which are currently in law enforcement possession, and the extraction from those properties of electronically stored information described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been since March 1, 2020. I have participated in numerous investigations involving the unlawful distribution of controlled substances and have conducted or participated in surveillance, the execution of search warrants, the recovery of substantial quantities of narcotics, narcotics paraphernalia, and proceeds from the sale of narcotics, and the debriefings of informants and cooperating witnesses. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have had extensive formal training in the fields of interdiction of illegal drugs, drug identification, interview and interrogation, law pertaining to search and seizure, surveillance operations, Title III intercept laws and procedures, affidavit drafting, drug cartel investigations,

and intelligence collection. I have received training in and have experience in the investigation of violations of the federal drug and money laundering laws.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. The properties to be searched are: (1) a white iPhone with no case, (2) a red iPhone with a clear floral case, and (3) a pink iPhone, all with unknown serial numbers, hereinafter the "Devices." The Devices are currently located at the HSI Office in the Philadelphia International Airport.

5. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## JURISDICTION AND STATUTES INVOLVED

6. This Court has jurisdiction to issue the warrant because the Devices are located in the Eastern District of Pennsylvania, and the crimes under investigation occurred in the Eastern District of Pennsylvania and elsewhere.

7. Based on my training and experience, I am familiar with the federal laws pertaining to the smuggling goods into the United States and the transfer or possession of a machinegun. Specifically, 18 U.S.C. § 545 provides that it is unlawful for a person to knowingly and willfully, with intent to defraud the United States, smuggle, or clandestinely introduce or attempt to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper. 18 U.S.C. §§ 922(o) provides that it is unlawful for any person to transfer or possess a machinegun.

**PROBABLE CAUSE**

8. As described in greater detail below, this investigation originated when U.S. Customs and Border Protection ("CBP") officers working at international airports identified and seized multiple parcels of machinegun conversion devices known as "Glock switches" addressed to Jefe HINES. Each of those parcels was shipped from China for delivery to addresses in Darby, Pennsylvania and Yeadon, Pennsylvania.

9. According to discussions with firearms experts from the Bureau of Alcohol, Tobacco and Firearms and Explosives ("ATF"), a Glock switch is generally comprised of three parts: (1) the back-plate; (2) the extended metal leg; and (3) the selector/retaining pin. The following photo, which is taken from ATF Bulletin No. 18-01, shows the three parts displayed respectively, from left to right.



10. According to records maintained by United States Customs, packages addressed to Jefe HINES, which are described more fully below, have previously been delivered from China to various locations in Yeadon and Darby, Pennsylvania, including 917 Longacre Boulevard in Yeadon and 117 Weymouth Road in Darby, Pennsylvania. As explained below, Jefe HINES is an alias used by Breyonne GIBSON.

*The March 2023 Parcel*

11.     On or about March 10, 2023, a CBP Officer at the FedEx parcel facility in Anchorage, Alaska conducted a routine examination of a parcel shipped via FedEx, bearing tracking number 3954 2653 0017, and shipped from sender Zonghuilin, Dengyingone Xiang78, FU Xiamen, 361006, China (Mainland). The parcel was addressed to Jefe HINES at 917 Longacre Boulevard, Yeadon, Pennsylvania and listed 215-995-1388 as the contact number. Through this investigation, agents learned that Bryonne Gibson uses the phone number 215-995-1388.

12.     An examination of the parcel by CBP revealed two full Glock switches, as well as eight back-plate components and eight extended metal "legs," two of three components of a Glock switch. The Glock switches were concealed in a Cryptex Lock Puzzle. A photograph of the contents of the parcel is shown below.



13.     On or about March 15, 2023, the parcel was forwarded to HSI Philadelphia and subsequently secured for further evaluation. The Customs Declaration associated with the parcel read "OTHER ZINC PRODUCTS" with a declared value of $4.00 USD. The actual contents of

the parcel —two full Glock switches, eight back-plate components, and eight extended metal "legs"— had an estimated value of $1,300.00.

14. According to law enforcement databases, 917 Longacre Blvd, Yeadon, PA is occupied by Norman Johnson, Dawn Presbery, and Eric Hill.

15. On March 15, 2023, ATF conducted a query of the Federal Licensing System. The query determined that none of the above residents at 917 Longacre Boulevard, possessed a Federal Firearm License and therefore none were licensed by the federal government to sell or import firearms.

*The March 2023 Controlled Delivery*

16. Based on my training and experience in executing controlled deliveries of contraband, including Glock switches, I know that, in order to distance himself or herself from the criminal conduct, the individual importing the Glock switches will sometimes have the package containing the Glock switches delivered to an address that is not associated with the individual. Then, after the package containing the Glock switches has been left at the delivery location, the individual or his or her agent, will obtain the package and take the package to another location.

17. On or about March 24, 2023, the Honorable Carol Sandra Moore Wells, U.S. Magistrate Judge, issued an anticipatory search warrant authorizing agents to search 917 Longacre Boulevard in Yeadon, Pennsylvania, or any other location into which the parcel was brought. Judge Wells further authorized agents to insert a GPS tracking device and break wire into the parcel. The triggering event for the search warrant was when the parcel was brought into 917 Longacre Boulevard, or any other location.

18. On or about March 27, 2023, a law enforcement agent posing as a delivery driver executed a controlled delivery of the parcel, leaving it on the doorstep of 917 Longacre Boulevard. After the undercover agent placed the parcel at the doorstep and left the area, a female came out of neighboring residence at 911 Longacre Boulevard and walked to the front door of 917 Longacre Boulevard. The female looked around, picked up the parcel and walked back to 911 Longacre Boulevard, whereupon she entered the residence and closed the door.

19. Agents conducted surveillance of 911 Longacre Boulevard for several minutes before they were alerted that the package was opened by way of the break wire sensor installed on the parcel. At approximately 11:30 a.m., agents executed the search warrant on 911 Longacre Boulevard.

20. Upon entering the premises, they encountered Sabrina FISHER, GIBSON's mother. After securing the premises, agents conducted Mirandized interviews of the inhabitants of 911 Longacre Boulevard.

21. During the interview of FISHER, she explained that GIBSON is her son and lives in the upstairs bedroom at the top of the stairs. FISHER explained that GIBSON sleeps there every night and leaves early in the morning to go to work.

22. Agents also identified the female that walked over to 917 Longacre Boulevard and collected the package as S.G[1], GIBSON's sister. S.G. explained that she received a message from GIBSON asking her to go to 917 Longacre Boulevard to get the package. S.G. explained that she told him (GIBSON) to stop ordering these "things" because she knew they were bad. This was an utterance in reference to the ordering, receiving and sale of Glock switches. S.G.

---

[1] S.G.'s identity is known to agents, but her initials are being used here because she is a juvenile.

6

also admitted to being the one who opened the package. S.G. also told agents that GIBSON's nickname is "Bre" and most that know him call him that.

23. S.G. further stated that GIBSON uses iMessage on his phone because he does not have a cellular plan on his phone. He must use Wi-Fi to communicate through the iMessage application on his iPhone or through messages on the SUBJECT ACCOUNT.

24. While agents were conducting the search of the premises on 911 Longacre Blvd., GIBSON continued to contact S.G.'s phone. Gibson utilized both iMessages from his cell phone number 215-995-1388, as well as message sent through his Instagram account, to contact his sister.

25. After receiving consent, agents observed numerous iMessages on S.G.'s phone from GIBSON, as well as messages from GIBSON's Instagram account. GIBSON requested that S.G. call him and answer his calls. S.G. confirmed that the Instagram account was her brother Breyonne GIBSON's account.

*Previous Parcels*

26. In June of 2021, agents found that a parcel was sent to 117 Weymouth Road in Darby, Pennsylvania that had characteristics consistent with containing Glock switches. This package was addressed to Breyonne GIBSON.

27. In September of 2021, CBP intercepted a parcel addressed to Breyonne GIBSON going to 117 Weymouth Road. This parcel had the same characteristics as the first and was found to contain Glock switches. During a law enforcement check, agents found that a Breyonne GIBSON lived at 125 Weymouth Road in Darby, Pennsylvania. This address is four houses down the street from 117 Weymouth Road.

28.     Agents believe that once the parcel was seized by CBP in September 2021, GIBSON stopped using his true and correct name on the parcel labels and used numerous aliases in an attempt to mask his true identity. This is often done because the recipient knows that these items are illegal to import and possess, and they will attempt to distance themselves from the parcel. Since the seizure in September of 2021, the following aliases have been used: SEFE BANKS, JEFE BANKS, SEAN HARRINGTON, JEFE HINES and PRINCESS CARONA.

29.     On or about October 24, 2022, HSI Special Agents performed a controlled delivery of a similar package containing Glock switches addressed to Jefe HINES located at 117 Weymouth Road, Darby, Pennsylvania 19023. According to the labeling on the package, it was shipped via USPS from Russia on or about August 28, 2022. Upon arriving in United States Customs at the JFK International Airport in New York City, New York, the package was opened and found to contain 10 complete Glock automatic switches. This controlled delivery, over two months after the parcel was shipped, was ultimately unsuccessful. Agents attempted to hand deliver the package to 117 Weymouth Road in Darby. However, the person who answered the door was not GIBSON and he refused to accept the package.

30.     On or about January 30, 2023, another parcel addressed to Jefe HINES at 917 Longacre Boulevard, Yeadon, Pennsylvania made entry into the United States. Although this parcel was not intercepted by Customs, it was similar in size, weight, and declaration of "OTHER ZINC PRODUCTS" to the March 2023 parcel which contained Glock automatic switches.

31.     Based on information collected from a search warrant of GIBSON's Apple iCloud, as well as other law enforcement investigative tools, it is believed that Breyonne Gibson

used the Devices to advertise and conduct the illegal sale of controlled substances and illegal firearms parts through the various platforms, including Instagram.

32. Information from an Apple iCloud search warrant showed that GIBSON's Instagram account had posted posts/stories advertising firearms, weapons parts, and controlled substances. Based on the search of previous Instagram accounts, subjects are known to conduct business through Instagram "stories" and the Instagram messenger application.

*Indictment and Arrest of Breyonne Gibson*

33. Breyonne GIBSON was indicted by a federal grand jury on August 3, 2023, for violations of Title 18, U.S.C. Section 922(o), Possession of a Machinegun. A warrant for GIBSON's arrest was issued contemporaneously with the return of the aforementioned indictment.

34. On September 12, 2023, HSI, along with the Pennsylvania Attorney General's Office, ATF, Philadelphia Police Department and Philadelphia County Sheriff's Office set up surveillance at 613 North Redfield St in Philadelphia. Through law enforcement means, agents were able to ascertain that GIBSON, a wanted fugitive, was at the location.

35. At approximately 3:15 PM, GIBSON, along with his girlfriend, Anyah Acres, exited the residence at 613 North Redfield Street and attempted to flee from law enforcement in a vehicle. GIBSON was subsequently removed from the vehicle and arrested. In the vehicle, law enforcement seized three cellular phones, along with a large amount of US currency.

36. As discussed above, there is probable cause to believe that GIBSON committed violations of 18 U.S.C. § 922(o). There is probable cause to believe that the Devices contain evidence of these crimes for the following reasons:

a. As discussed above, the Devices were found in the possession of GIBSON after executing the federal arrest warrant.  In my training and experience, cellular phones like the Devices contain evidence of who used or owned the phone, such as communications (including voice mail, voice messages, text messages, and communications via applications downloaded onto the phone), photographs, videos, saved usernames and passwords, documents, browsing history, GPS data, address books, directories, and calendars.  These records constitute evidence of the crimes under investigation because it may show who used or possessed the Devices.

b. Based on my training and experience, individuals engaged in firearms trafficking crimes commonly take pictures or videos of firearms, cash, or other events relevant to their drug trafficking activities (such as stash houses or vehicles), in order to share with co-conspirators.  For example, traffickers who distribute firearms, as I believe GIBSON and his co-conspirators do, commonly send pictures of parcels and tracking numbers to co-conspirators.  Accordingly, there is probable cause to search the Devices for pictures and videos related to the unlawful distribution of firearms and conspiracy to commit such firearm trafficking crimes.

c. There is probable cause to believe a search of various communications and other telephone numbers stored on the Devices will assist investigators with the identification of other co-conspirators since co-conspirators commonly use these devices to communicate.

37. The Devices are currently in the lawful possession of HSI. It came into HSI's possession when it was seized incident to arrest. Therefore, while HSI might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

38. The Devices are currently in storage at the HSI Office in the Philadelphia International Airport. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of HSI.

*Technical Terms*

39. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

    dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets,

        and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

        f.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    40.    Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, PDAs, and a means of accessing the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

    41.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

    42.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices

consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

44. *Manner of execution.* Because this warrant seeks only permission to examine Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

45. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Nicholas C. Pisani
Special Agent
Homeland Security Investigations

Subscribed and sworn to
before me this __th day of
October, 2023

_____
THE HONORABLE CRAIG M. STRAW
*United States Magistrate Judge*

## **ATTACHMENT A**

The properties to be searched are: (1) a white iPhone with no case, (2) a red iPhone with a clear floral case, and (3) a pink iPhone, all with unknown serial numbers, hereinafter the "Devices." The Devices are currently located at the HSI Office in the Philadelphia International Airport.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records and information on the Devices described in Attachment A, that relate to violations of 18 U.S.C. § 922(o) and involve BREYONNE GIBSON including:

    a. Evidence of user attribution showing who used or owned the Devices, such as communications (including voice mail, voice messages, text messages, and communications via applications downloaded onto the phone), photographs, videos, saved usernames and passwords, documents, browsing history, GPS data, address books, directories, and calendars.

    b. Photographs and videos relating to the possession and sale of machine guns and the coordination of smuggling of goods into the United States.

    c. Communications (including voice mail, voice messages, text messages, and communications via applications downloaded onto the phone) regarding the unlawful possession and sale of machine guns and the coordination of smuggling of goods into the United States.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.